**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

QCX LLC d/b/a Polymarket US,

     *Plaintiff*,

       v.

RAÚL TORREZ, in his official capacity as Attorney General of New Mexico;
TERRY MCGAHA, in his official capacity as Acting Executive Director of the New Mexico Gaming Control Board;
PATRICK GARRETT, in his official capacity as Chairman of the New Mexico Gaming Control Board;
DARREN WHITE, in his official capacity as Commissioner of the New Mexico Gaming Control Board;
VAN BILLOPS, in his official capacity as Commissioner of the New Mexico Gaming Control Board;
MEKKO M. MILLER, in his official capacity as Commissioner of the New Mexico Gaming Control Board; and
BILLY G. SMITH, in his official capacity as Commissioner of the New Mexico Gaming Control Board,

     *Defendants*.

Case No.: _____

**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. This action seeks to prevent imminent and irreparable harm arising from New Mexico's enforcement of state gambling laws against federally regulated derivatives exchanges—enforcement Congress has expressly prohibited. Plaintiff QCX LLC d/b/a Polymarket US operates a lawful, nationwide designated contract market subject to the exclusive jurisdiction of the Commodity Futures Trading Commission ("CFTC"). Through the Commodity Exchange Act ("CEA"), Congress vested the CFTC with sole regulatory authority over event contracts and other derivatives traded on designated contract markets. Exercising this exclusive, comprehensive

1

authority, the CFTC regulates exchange-traded event contracts and decides whether to prohibit certain event contracts as contrary to the public interest.  7 U.S.C. § 7a-2(c)(5)(C).

2.      The threat to Polymarket US is immediate.  On June 4, 2026, New Mexico sued another CFTC-designated contract market, Kalshi, on the theory that federally regulated event-contract trading constitutes "unlicensed online sports betting."  Complaint, *Torrez v. Kalshi, Inc.*, D-101-CV-2026-01567 (First Judicial Dist. Ct., Santa Fe Cty. June 4, 2026), ¶ 173.  Following that suit, Polymarket US engaged in meet-and-confer discussions with the New Mexico Department of Justice ("NMDOJ") in an effort to avoid unnecessary litigation.  On June 8, 2026, Polymarket US requested that New Mexico defer any enforcement action pending resolution of the Kalshi litigation.  After the CFTC sued New Mexico, Polymarket US renewed that request on June 22, 2026, asking New Mexico to defer enforcement pending resolution of the CFTC's motion for a preliminary injunction.  *See* Motion for Preliminary Injunction, *United States v. New Mexico*, 26-cv-01912 (D.N.M. June 18, 2026) ("CFTC New Mexico PI Mot.").  On June 29, 2026, NMDOJ rejected those proposals.  Defendant New Mexico Attorney General Raúl Torrez has also signed on to amicus briefs supporting other states' efforts to enforce state gaming laws against CFTC-designated contract markets.  *See infra* ¶ 71.  These actions demonstrate Defendants' intent to use state law to shut down federally authorized markets despite clear federal preemption.  Polymarket US therefore faces a real and imminent risk of enforcement, exposing it to civil penalties, potential criminal liability, forced cessation of operations within New Mexico, and severe collateral consequences to its nationwide operations.

3.      The resulting harm of the State's enforcement would be irreparable.  Even a meritless state enforcement action would immediately disrupt Polymarket US's federally authorized operations, fragment a national market, reduce liquidity, jeopardize critical banking and

commercial relationships, undermine user trust, and harm New Mexico residents. Even the *threat* of enforcement forces Polymarket US to choose between exercising its federal right to operate nationwide or submitting to unlawful state coercion. The resulting disruption to a nationally uniform market cannot be remedied through damages. And the chilling effect on lawful activity and the deprivation of New Mexico residents' access to a federally regulated exchange is precisely the harm Congress sought to prevent when it vested the CFTC with sole regulatory authority over derivatives traded on designated contract markets.

4.      Any enforcement action by New Mexico *would* be meritless. In 1974, Congress amended the CEA to grant the CFTC "exclusive jurisdiction" over certain derivatives "traded or executed on a contract market" designated under the Act. 7 U.S.C. § 2(a)(1)(A). Since then, Congress has repeatedly expanded the CFTC's exclusive authority to cover new derivatives— including event contracts—traded on federally regulated contract markets. As the Third Circuit recently recognized, "the text of the Act preempts otherwise applicable state laws that purport to regulate . . . event contracts on CFTC-licensed [contract markets]." *KalshiEX LLC v. Flaherty*, 172 F.4th 220, 228 (3d Cir. 2026).

5.      New Mexico's enforcement action against Kalshi is just one of a spate of state efforts to undermine the CFTC's exclusive jurisdiction. Currently engaged in a multi-state campaign to defend that jurisdiction, the CFTC has sought a preliminary injunction here and against regulators in other jurisdictions that are attempting to interfere with contract markets' operations. *See* CFTC New Mexico PI Mot. The only court to rule on such a request to date has granted the CFTC's motion, concluding that "field and conflict preemption independently bar[red]" state regulation of event contracts traded on CFTC-regulated contract markets. *KalshiEX LLC v. Johnson*, 2026 WL 1223373, at *5 (D. Ariz. May 5, 2026).

6. Defendants suffer no cognizable harm from being barred from enforcing laws in a domain Congress explicitly removed from state control. The State's local interests are already governed and safeguarded by the CFTC's exclusive federal oversight. By contrast, absent judicial intervention, New Mexico's actions threaten to fracture a nationally uniform federal regulatory regime, disrupt lawful markets, burden interstate commerce, and deprive consumers of access to platforms Congress sought to protect.

7. For these reasons, Polymarket US seeks declaratory and injunctive relief to prevent unlawful state overreach, maintain the integrity of the federal regulatory framework, and avert imminent harm that cannot be remedied after the fact.

## JURISDICTION AND VENUE

8. This is an action for declaratory and injunctive relief brought under the Court's equitable powers, *see Ex parte Young*, 209 U.S. 123 (1908), to enforce the Supremacy Clause. The federal question presented is whether New Mexico state law, including NMSA 1978, §§ 30-8-1, 30-8-8, 30-19-1(B)–(C), 30-19-2, 30-19-3, and 30-19-8, and New Mexico common law is preempted by the CEA, 7 U.S.C. §§ 1 *et seq*. This Court has jurisdiction to grant the relief sought in this action under 28 U.S.C. §§ 1331, 2201, and 2202.

9. This Court has personal jurisdiction over Defendants. Defendants are domiciled and perform their duties in New Mexico.

10. Venue is proper in this district under 28 U.S.C. § 1391(b). All Defendants are residents of the State of New Mexico and the events giving rise to these claims occurred in this District.

## PARTIES

11. Plaintiff Polymarket US is a Delaware limited liability company with its principal place of business in New York. Polymarket US operates a derivatives exchange and

prediction market where users can buy, sell, and exchange financial products known as event contracts. Polymarket US is a contract market that is federally licensed and regulated by the CFTC pursuant to the CEA.

12.    Defendant Raúl Torrez is the Attorney General of New Mexico. This suit is brought against Attorney General Torrez in his official capacity. The Attorney General of New Mexico is the State's chief law enforcement officer. At the request of the New Mexico Gaming Control Board, the Attorney General may institute a civil action for any alleged violations of the New Mexico Gaming Control Act. *See* NMSA 1978, § 60-2E-48(A). The Attorney General is also authorized to bring enforcement actions for alleged violations of state gambling laws pursuant to NMSA 1978, §§ 8-5-2 and 30-19-1 to -15; and the New Mexico Gaming Control Act, NMSA 1978, §§ 60-2E-1 to -62.

13.    Defendant Terry McGaha is the Acting Executive Director of the New Mexico Gaming Control Board. This suit is brought against Director McGaha in his official capacity. The Director has authority to issue orders and instructions to ensure compliance with the Gaming Control Act. NMSA 1978, § 60-2E-10.

14.    Defendant Patrick Garrett is the Chairman of the New Mexico Gaming Control Board. This suit is brought against Chairman Garrett in his official capacity. The Board is authorized to "implement the state's policy on gaming consistent with the . . . Gaming Control Act," including by imposing civil fines for any violations. NMSA 1978, § 60-2E-7.

15.    Defendant Darren White is Commissioner of the New Mexico Gaming Control Board. This suit is brought against Commissioner White in his official capacity.

16.    Defendant Van Billops is Commissioner of the New Mexico Gaming Control Board. This suit is brought against Commissioner Billops in his official capacity.

17.     Defendant Mekko M. Miller is Commissioner of the New Mexico Gaming Control Board.  This suit is brought against Commissioner Miller in his official capacity.

18.     Defendant Billy G. Smith is Commissioner of the New Mexico Gaming Control Board.  This suit is brought against Commissioner Smith in his official capacity.

## FACTUAL AND LEGAL BACKGROUND

**A.     Event contracts are derivative financial instruments that incorporate real-time information to generate accurate predictions about real-world events.**

19.     This case is about derivatives—financial instruments that derive their value from an underlying asset or event.  Derivatives, the Supreme Court has long recognized, "are of the utmost importance to the business world."  *Bd. of Trade of City of Chi. v. Christie Grain & Stock Co.*, 198 U.S. 236, 248–49 (1905).

20.     One common kind of derivative is a "swap."  Swaps are financial contracts where two parties agree to exchange, or swap, payments with each other based on a pre-agreed formula—say, the price of crude oil, interest rates, or the outcome of a real-world event.

21.     An event contract, in turn, is a swap "whose settlement is based on the outcome of an underlying occurrence or event."  CFTC Staff Advisory at 2, CFTC LTR No. 26-08 (Mar. 12, 2026) ("*Prediction Markets Advisory*"); *see also Flaherty*, 172 F.4th at 226 ("'[S]wap' includes event contracts."); *Johnson*, 2026 WL 1223373, at *3–4 ("Event contracts satisfy both elements" of the CEA's definition of "swap").

22.     Events "may relate to economics, or elections, or climate, or sports, or anything else of potential financial, economic, or commercial consequence."  *See, e.g.*, Complaint, *United States v. Minnesota*, No. 26-cv-02661 (D. Minn. May 19, 2026), Dkt. 1 ¶ 3.

6

23. Event contracts "are derivative instruments that allow two parties to speculate on future market conditions without owning the underlying asset."[1]

24. "[Event] contracts are not novel innovations." Amicus Brief of CFTC, *KalshiEX LLC v. Schuler*, No. 26-3196 (6th Cir. May 12, 2026), Dkt. 31 at 7 ("CFTC Sixth Cir. Amicus Br."). "'Since 1992, the Commission-regulated exchanges have listed for trading a variety of commodity futures and options contracts with payout terms based on' events 'as diverse as regional insured property losses, the count of bankruptcies, temperature volatilities, corporate mergers, and corporate credit events.'" *Id.* (quoting 73 Fed. Reg. 25669, 25671 (May 7, 2008)). In 1993, for example, the Commission authorized the Iowa Electronic Markets to list contracts pegged to presidential elections. *Id.* at 7–8. "Years later, HedgeStreet, now known as Nadex, became the first marketplace to offer event-driven binary contracts that allowed retail traders to speculate on mortgage rates and gasoline prices." *Chairman Selig: Op-Ed*, *supra*.

25. Event contracts often have a "binary payoff structure." *Prediction Markets Advisory* at 2. One party takes the position that a particular event will occur (the "yes" position), and the other takes the position that the event will not occur (the "no" position). The terms of the contract specify its payout and expiration date. For example, the parties might take a position on whether Santa Fe will get more than 2.75 feet of snow (the approximate yearly average) in 2026. At the end of the year, the party that correctly predicted the outcome is paid the agreed amount by the party that did not. If 2026 turns out to be an especially snowy year and Santa Fe sees 3 feet of snow, the party that took the "yes" position on the weather contract would be paid and the party that took the "no" position would not.

---

[1] *Chairman Michael S. Selig: Op-Ed: States Encroach on Prediction Markets*, Commodity Futures Trading Comm'n (Feb. 17, 2026), https://www.cftc.gov/PressRoom/SpeechesTestimony/selig statement021726.

26.     Event contracts have any number of uses.  For example, they can be used "to hedge event-driven risks."  *Chairman Selig: Op-Ed*, *supra*.  A hardware store in Santa Fe might purchase an event contract predicting that the city will have a particularly warm year.  If the weather turns out as the owner predicted, the payout from the contract could offset the owner's loss of income from replacing a heating system.  *See Johnson,* 2026 WL 1223373, at *5 ("[W]eather events produce commercial consequences for a wide range of market participants.").

27.     Event contracts can have enormous predictive value.  Because they may be purchased and sold at any time before the expiration date, the price will reflect the trader's own expectations about the likelihood of a particular outcome.  Consider a contract that pays out $1 based on whether the Denver Broncos win the AFC Championship.  As traders buy and sell positions on that contract, its price changes to reflect traders' overall perception about the contract's value.  If traders think the outcome is increasingly likely, demand for "yes" positions will increase and so will the price.  When the outcome seems less likely, the opposite will occur: Demand for "yes" positions will drop, and the price will drop with it.  The result is that the price of the contract will reflect the overall market's view, in real time, about the probability of the outcome.  And those probabilities are set by trading activity, not unilaterally fixed odds.

28.     Prediction markets, where event contracts are traded, are "used by tens of millions of Americans."  *Chairman Selig: Op-Ed*, *supra*.  As the CFTC observed in its advisory letter to designated contract markets, prediction markets "are rapidly increasing in popularity with the American public both as a financial asset class and as a proven source of reliable information for news media, sports leagues, financial institutions, and everyday Americans."  *Prediction Markets Advisory* at 1.  They generate valuable public information about the most important real-world events—finance, weather, news, technology, and sports, to name a few.  Because traders

put capital at stake, prediction markets incentivize accurate predictions. And because prediction markets enable real-time trading on a nationwide basis, they aggregate diverse perspectives and rapidly incorporate new information. As a result, prediction markets regularly outperform pundits and polls.

29.    When it comes to "sports forecasting," for example, empirical studies show that prediction markets "significantly outperform" the experts. *E.g.*, M. Spann & B. Skiera, *Sports Forecasting: A Comparison of the Forecast Accuracy of Prediction Markets, Betting Odds and Tipsters*, 28 J. Forecasting 55, 65 (2009).[2]

30.    The same is true of elections. For example, although pollsters initially dismissed Zohran Mamdani as a candidate in the New York Democratic mayoral primary, prediction markets accurately predicted Mamdani's eventual victory.[3]

31.    Event contracts, like other derivatives, provide significant financial value and generate rich information. They allow parties to mitigate risk, although others are equally free to trade; more participants means more liquidity, more efficient trading, and a greater predictive function. Event contracts supply investment opportunities for traders willing to put time and effort into thinking through the likelihood of occurrences in the real world. And, through the collective wisdom of these efficient, transparent markets, event contracts provide precise, real-time information about events that matter to the public at large.

---

[2] https://tinyurl.com/2zm5axpc.

[3] Newsweek, *Zohran Mamdani's Chances of Beating Eric Adams, According to Polls* (June 25, 2025), https://www.newsweek.com/zohran-mamdani-chances-beating-eric-adams-new-york-mayor-odds-polymarket-polls-2090431; Vince Dioquino, *Polymarket Nails NYC Democratic Mayoral Primary Upset, Nears $1B Unicorn Valuation*, Decrypt (June 25, 2025), https://decrypt.co/326892/polymarket-nails-nyc-democratic-mayoral-primary-upset-nears-1b-unicorn-valuation.

**B.**     **Over the past century, federal regulation of exchange-traded derivatives has become extensive—and exclusive.**

32.     For about as long as derivatives trading has existed in the United States, however, individual States have attempted to regulate or prohibit it as unlawful gambling. "[T]he long history of federal regulation" in this area, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 393 (1982), is a direct result of those "coarse attempts" to manage our increasingly "complex society," *Christie Grain*, 198 U.S. at 247–48.

33.     The federal government first intervened in 1922, requiring futures transactions for grain to be "consummated on an exchange designated as a 'contract market' by the Secretary of Agriculture." *Merrill Lynch*, 456 U.S. at 360–61.

34.     Congress buttressed this federal scheme a decade later with the CEA but initially left the States a role in regulating these kinds of derivatives. It provided that the federal law would not "impair" the enforcement of "any State law applicable to any transaction" covered by the Act. Pub. L. No. 74-675, § 5, 49 Stat. 1491, 1494 (1936). States were therefore free to "supplement[] or bolster[] the federal scheme." *Rice v. Bd. of Trade of City of Chi.*, 331 U.S. 247, 255 (1947).

35.     By the 1970s, however, exchanges had become too important to the national economy to permit "[v]aried and often conflicting" state laws to interfere with national exchanges subject to federal control. 119 Cong. Rec. 41333 (1973). So Congress created the CFTC and enacted "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex," *Merrill Lynch*, 456 U.S. at 356, "to do away with the patchwork of state regulations and bring futures trading on [designated contract markets] under the exclusive jurisdiction of the CFTC," *Flaherty*, 172 F.4th at 230.

36.    To that end, Congress granted the CFTC "*exclusive jurisdiction* . . . with respect to accounts, agreements . . . and transactions involving . . . contracts of sale of a commodity for future delivery . . . traded or executed on a contract market designated" under the CEA.  7 U.S.C. § 2(a)(1)(A) (emphasis added).  "The purpose of this was to separate the functions of the new CFTC from those of the SEC and other regulators," including state regulators.  *Leist v. Simplot*, 638 F.2d 283, 314 (2d Cir. 1980); *see also Kelly v. Carr*, 691 F.2d 800, 803 (6th Cir. 1980) ("The idea that the C.F.T.C. should regulate the area was firmly expressed.").  As the CFTC itself has explained, "[p]reemption was an express goal of the CFTC Act."  CFTC Sixth Cir. Amicus Br. 7.

37.    Courts immediately recognized "that state regulatory agencies [were] preempted by the 'exclusive jurisdiction' of the CFTC" from encroaching on the CFTC's federal authority.  *Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979); *accord, e.g.*, *Leist*, 638 F.2d at 322; *United States v. Brien*, 617 F.2d 299, 310 (1st Cir. 1980); *Westlake v. Abrams*, 504 F. Supp. 337, 343–44 (N.D. Ga. 1980); *Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978).

38.    State officials protested this change.  A state securities commissioner from Minnesota bemoaned that, because the CFTC had "the authority to regulate" commodity markets "exclusively," courts had "precluded the application of state securities laws to any transactions involving commodities."  *Extend Commodity Exchange Act: Hearings on H.R. 10285 Before the Subcomm. on Conservation & Credit of the H. Comm. on Agric.*, 95th Cong. 363–64 at 383 (1978).  By "giv[ing] exclusive jurisdiction over commodities regulation to the Commodity Futures Trading Commission," one Texas commissioner complained, Congress had "dismantled an effective regulatory system within the states."  *Id.*  And another Secretary of State demanded that

11

Congress "abolish the exclusive jurisdiction of the CFTC and the consequent preemption of state action against commodity-related fraud." *Id.* at 379.

39.     Following the 2008 financial crisis, Congress again changed the regulatory landscape.  The Dodd-Frank Act of 2010 innovated and expanded CFTC authority in two ways relevant here.

40.     *First*, the Act added exchange-traded swaps to the types of derivatives within the CFTC's exclusive jurisdiction.  As a result, the CFTC now exercises "exclusive jurisdiction . . . with respect to . . . transactions involving swaps . . . traded or executed on a contract market designated" by the CFTC.  7 U.S.C. § 2(a)(1)(A); *see also* Motion for Preliminary Injunction, *KalshiEX LLC v. Johnson*, No. 2:26-cv-01715 (D. Ariz. Apr. 8, 2026) ("CFTC Arizona PI Mot."), Dkt. 49 at 10–11.

41.     Event contracts are covered by the Act because payment for event contracts is "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."  7 U.S.C. § 1a(47)(A)(ii) (defining "swap").

42.     *Second*, the Act introduced what is known as the "Special Rule," which supplies the CFTC the discretion—but not the obligation—to prohibit the trading of "[e]vent contracts" involving subjects including "terrorism," "assassination," "war," and "gaming," if it determines that they are "contrary to the public interest."  7 U.S.C. § 7a-2(c)(5)(C).  "By creating a specific public-interest review process, Congress signaled that these contracts belong within the [CFTC]'s exclusive regulatory purview, not the States'."  Complaint, *United States v. Arizona*, No. 2:26-cv-0224 (D. Ariz. Apr. 2, 2026), Dkt. No. 1 ¶ 54 ("Arizona Compl.").  All told, the CEA grants the CFTC "exclusive jurisdiction" to regulate exchange-traded event contracts, to determine whether

they involve "gaming," and to prohibit them based on the CFTC's view of the public interest.  7 U.S.C. §§ 2(a)(1)(A), 7a-2(c)(5)(C).  And its "text is designed to account for financial innovation," albeit under the watchful eye of the CFTC.  *Chairman Selig: Op-Ed*, *supra*.

**C.      The CEA sets forth the comprehensive regulatory framework for event contracts.**

43.      The CFTC exercises its exclusive jurisdiction through a comprehensive regulatory framework.  Certain derivatives trading in the United States must take place on a board of trade that the CFTC has designated as a contract market.  7 U.S.C. §§ 2(e), 6(a)(1), 7(a).  That designation reflects a rigorous federal determination that the contract market satisfies extensive requirements governing market integrity, transparency, financial safeguards, and customer protection.

44.      The CFTC-designation process is a demanding one because contract markets are charged with a broad array of functions that the CFTC itself would otherwise have to perform.  To obtain approval to operate a designated contract market, an entity must demonstrate to the CFTC that it complies with the CEA's 23 "core principles."  17 C.F.R. § 38.3(a)(2); *see* 7 U.S.C. §§ 7(d), 8(a).  Core principle 1 requires the contract market to comply with *all* CFTC regulations.  *See* 17 C.F.R. § 38.100(a)(2).  And core principle 2 requires that the entity be "transparent" in its criteria for accessing the market, *id.* § 38.151(b)(1), prohibit abusive, "manipulative[,] or disruptive trading practices," *id.* § 38.152, "maintain an automated trade surveillance system capable of detecting and investigating potential trade practice violations" based on "specific trade execution patterns and trade anomalies," *id.* § 38.156, and "conduct real-time market monitoring of all trading activity on its electronic trading platform(s) to identify disorderly trading and any market or system anomalies," *id.* § 38.157.

45.      The remaining core principles provide further protection against contract manipulation, ensure that risk controls are in place to limit market disruptions, and require daily

publication of the price and volume of actively traded contracts. *See* 17 C.F.R. §§ 38.200–38.301; 7 U.S.C. § 7(d)(8). For example, a designated contract market must "establish, monitor, and enforce compliance with the rules of the contract market," including "access requirements," "the terms and conditions of any contracts to be traded on the contract market" and "rules prohibiting abusive trade practices on the contract market." 7 U.S.C. § 7(d)(2)(A). And those rules must provide "impartial access to its markets and services" using "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner." 17 C.F.R. § 38.151(b). These rules, the CFTC has explained, "play" an "important role . . . in promoting the integrity of derivatives markets." *Prediction Markets Advisory* at 2.

46.      In short, to obtain designation as a contract market, applicants must show that they can be trusted to establish, monitor, and enforce rules for the markets they operate. As CFTC Chairman Michael S. Selig has explained, contract markets "aren't the Wild West"—they are "self-regulatory organizations that are examined and supervised by experienced CFTC staff." *Chairman Selig: Op-Ed*, *supra*; *see* 7 U.S.C. § 5(b) (purpose of the CEA is to "serve the public interest[] . . . through a system of effective self-regulation of trading facilities"); *see also* Complaint, *United States v. Wisconsin,* No. 2:26-cv-00749 (E.D. Wis. Apr. 28, 2026), Dkt. No. 1 ¶¶ 33–37 ("Wisconsin Compl.").

47.      Designated contract markets may not list new kinds of contracts on their exchanges without first submitting the contract for CFTC approval or certifying that the contract complies with federal law and the CFTC's requirements. 7 U.S.C. § 7a-2(c)(1). The most common method of certification is known as self-certification. Before listing a new contract, the designated contract market must supply the CFTC with a "certification . . . that the product to be listed complies with the [CEA]" and CFTC regulations, as well as "[a] concise explanation and

analysis"—with accompanying documentation—"with respect to the product's terms and conditions" and "the product's compliance with applicable provisions of the Act, including core principles, and the Commission's regulations," among other things.  17 C.F.R. § 40.2(a); *see* 7 U.S.C. § 7a-2(c)(1).

48.      Self-certification is permissible only because "self-regulatory organizations such as contract markets possess a form of delegated" government authority, *Barry v. Cboe Glob. Mkts., Inc.*, 42 F.4th 619, 625 (7th Cir. 2022), a privilege earned only after demonstrating the extensive regulatory compliance necessary to receive CFTC designation.  The CFTC retains authority to investigate, stay, or amend the contract even after it has been listed.  17 C.F.R. § 40.2(c).

49.      More broadly, the CFTC wields considerable tools for enforcing the CEA and its regulations.  For example, the CEA empowers the agency to subpoena testimony and documents, 7 U.S.C. § 9(5), bring administrative enforcement actions, *id.* §§ 9(4), 13b, and sue in federal court for injunctive relief, monetary penalties, the appointment of receivers, disgorgement, restitution, the rescission of contracts, and the imposition of trading and registration bans, *id.* § 13a-1.

**D.      The CFTC licenses Polymarket US as a designated contract market subject to federal law and the CFTC's exclusive jurisdiction.**

50.      The CFTC granted Polymarket US its designation as a contract market on July 9, 2025, finding that the platform now doing business as Polymarket US could and would comply with the CEA and the CFTC's regulations.  Order of Designation, *In re Application of QCX LLC for Designation as a Contract Market*, Commodity Futures Trading Comm'n (July 9, 2025).

51.    Today, Polymarket US specializes in contracts concerning real-world events of public interest. Since September 30, 2025, Polymarket US has self-certified various financial, weather, cultural, governmental, election-related, and sports-related event contracts. *See* 7 U.S.C. § 7a-2(c); CFTC, Designated Contract Market Products (listing self-certifications for contracts).[4]

52.    These event contracts fall within the heart of the CFTC's exclusive jurisdiction. Payment on one of Polymarket US's listed event contracts is "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

53.    One example is event contracts based on which political party will control the United States Senate or United States House of Representatives following the November 3, 2026, elections. Businesses, investors, financial institutions, and consumers routinely adjust their behavior based on which party will control Congress because legislative control can affect taxation, spending, regulation, and other matters with significant economic effects.

54.    Another example is event contracts based on the winner of the Super Bowl. The Super Bowl's "associat[ion] with a potential financial, economic, or commercial consequence" is obvious. 7 U.S.C. § 1a(47)(A)(ii). Winning the Super Bowl causes a team's valuation to surge, retailers' sales of merchandise of that team to skyrocket, and hometown sales to spike. In 2025, for example, the Eagles took in over $1 billion in revenue from their 2025 win, with Philadelphia restaurants, retailers, and hotels also able to capitalize off the team's success.[5] Retailers also

---

[4] https://tinyurl.com/yamausyk.

[5] *See, e.g.*, Rachel Moore, *Eagles to generate $1.2B Economic Impact with Super Bowl Parade Season*, PHL17 (Feb. 13, 2025), https://phl17.com/phl17-news/eagles-to-generate-1-2b-economic-impact-with-super-bowl-parade-season/ (last visited June 3, 2026); Jensen Toussaint, *Philadelphia Eagles Valuation Likely to Skyrocket After Second Super Bowl Win*, Philadelphia.Today (Feb. 15, 2025), https://philadelphia.today/2025/02/philadelphia-eagles-valuation-to-rise/ (last visited June 3, 2026).

regularly tie promotions to game results, including the identity of the winning team, final score, and game duration.[6]

56.    Sports-related event contracts are not the same as sportsbooks. The financial products and regulatory regimes differ in fundamental ways.

56.    Event-contract prices are formed by matching buyers and sellers among diverse market participants on these national exchanges. Sports betting, by contrast, is conducted through local sportsbooks—regulated at the state level—with each sportsbook independently setting the terms of its wagers. The incentives in sports betting and derivatives markets are different. Sportsbooks set odds based on proprietary information; event contracts are priced by supply and demand in a relevant market—*i.e.*, buying and selling activity reflecting the diverse perspectives of millions of individual traders on a given event. And sports bettors typically place wagers against the "house," so sports bettors and sportsbooks are counterparties to the gambling transaction. But Polymarket US does not operate as a counterparty in the derivatives market. Instead, it operates as a transparent, centralized exchange matching orders of third parties. Polymarket US makes money by charging a flat fee for each transaction; unlike a sportsbook, it does not make money when a bettor loses, and it makes the same amount regardless of the outcome of a particular event.

57.    Federal law governs event contracts of all kinds—including sports-related ones—traded on designated contract markets. That is, all derivative instruments listed on centralized exchanges operate pursuant to extensive federal product certification, registration, and

---

[6] *See, e.g.*, *Albuquerque Isotopes*, Facebook (Sept. 21, 2025), https://www.facebook.com/ ABQTopes/posts/winner-winner-8-ct-nugget-dinner-topes-win-10-5-you-scored-a-free-8-ct- nuggets-f/1349687507167864/ (last visited June 4, 2026) (advertising a Chick-Fil-A promotion for free 8-count nugget meals following an Albuquerque Isotopes win); *Buffalo Wild Wings* (@bwwings), Instagram (Feb. 8, 2026), https://www.instagram.com/p/ DUgIPoekVo8/ (offering customers six free wings if the Super Bowl goes into overtime).

17

approval procedures.  Sports-event contracts, like any other "transactions subject to" the CEA, "are entered into regularly in interstate . . . commerce and are affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information."  7 U.S.C. § 5(a).  They are therefore traded on a national exchange and regulated on the national level to ensure "trading in liquid, fair and financially secure trading facilities."  *Id.*

58.     In contrast, sportsbooks operate under the auspices of state law.  And because sports gambling is regulated on a state-by-state basis, sportsbooks tend to be local operations governed by local laws.  *See Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294, 1302 (3d Cir. 1996).

**E.     The CFTC has vigorously defended its exclusive jurisdiction over designated contract markets.**

59.     The CFTC has resisted States' attempts to encroach upon its exclusive jurisdiction over designated contract markets.  It has publicly advocated for its exclusive prerogative to regulate event contracts, assertively pursued litigation, and acted as an amicus in support of private parties' fights against states' jurisdictional overreach.

60.     Earlier this year, CFTC Chairman Selig reiterated that "prediction markets" and "event contracts" "have operated within the CFTC's regulatory perimeter for more than two decades" and have played an "important role . . . in the broader financial system."[7]  He warned that state litigation against federally regulated markets injects uncertainty that "has not served our markets well" and harms "the public interest."  *Id.*  To protect its jurisdiction, he directed the CFTC to reassess its litigation posture in cases implicating jurisdictional boundaries, emphasizing that

---

[7] Remarks of Chairman Michael S. Selig, *The Next Phase of Project Crypto: Unleashing Innovation for the New Frontier of Finance* (Jan. 29, 2026), https://www.cftc.gov/Press Room/SpeechesTestimony/opaselig1.

where "jurisdictional questions" arise, "the Commission has the expertise and responsibility to defend its exclusive jurisdiction over commodity derivatives." *Id.* "The CFTC will no longer sit idly by," he admonished, "while overzealous state governments undermine the agency's exclusive jurisdiction over these markets by seeking to establish statewide prohibitions on these exciting products." *Chairman Selig: Op-Ed, supra.*

61.     The CFTC has followed through with this warning.  In recent months, the Commission has sued numerous States that have sought to outlaw, regulate, or otherwise restrain federally regulated prediction markets.  *CFTC Sues Trio of States to Reaffirm its Exclusive Jurisdiction Over Prediction Markets*, CFTC Press Release No. 9206-26 (Apr. 2, 2026) ("*CFTC Press Release*").[8]

62.     The CFTC explained that those state efforts "intrude[] on the exclusive federal scheme Congress designed to oversee national swaps markets," and would "undermine [the] uniformity" Congress mandated, *see, e.g.*, New Mexico Compl. ¶¶ 4, 64, by subjecting CFTC-regulated exchanges to a "fragmented patchwork of state regulations" that have "resulted in poorer consumer protection and increased risk of fraud and manipulation," *CFTC Press Release*, *supra*. The CFTC also emphasized that event contracts traded on designated contract markets are "swaps" within the meaning of the CEA and fall squarely within the CFTC's exclusive jurisdiction, which prohibits States from "invad[ing]" that authority. *See, e.g.*, New Mexico Compl. ¶¶ 3, 6.  Those federally regulated markets include Polymarket US. *Id.* ¶¶ 5, 37.

---

[8] *See also* Complaint, *United States v. Arizona*, No. 2:26-cv-0224 (D. Ariz. Apr. 2, 2026), Dkt. 1 ("Arizona Compl."); Complaint, *United States v. Connecticut*, No. 3:26-cv-00498 (D. Conn. Apr. 2, 2026), Dkt. 1; Complaint, *United States v. Illinois*, No. 1:26-cv-03659 (N.D. Ill. Apr. 2, 2026), Dkt. 1; Complaint, *United States v. New York*, No. 1:26-cv-03404 (S.D.N.Y. Apr. 24, 2026), Dkt. 1; Complaint, *United States v. Wisconsin*, No. 2:26-cv-00749 (E.D. Wis. Apr. 28, 2026), Dkt. 1.

19

63.    The CFTC's suit in New Mexico is its latest effort to defend its exclusive jurisdiction.  On June 12, 2026, the CFTC sued the State "to halt [its] efforts to prohibit the operation of derivatives markets governed by federal law," CFTC New Mexico Compl. ¶ 1, and moved for a preliminary injunction barring New Mexico from enforcing state laws that are preempted by the CEA, CFTC New Mexico PI Mot. 1.  The CFTC argues that New Mexico's "incursion into the Commission's domain is unlawful" and "violat[es] [the Commission's] exclusive jurisdiction and the Supremacy Clause." *Id*. at 10, 22.

64.    The CFTC has also moved for preliminary injunctions in Minnesota, Arizona, New York, and Wisconsin, seeking to prohibit the States from pursuing criminal or civil enforcement actions against CFTC-regulated contract markets.[9]

65.    The only court that has so far ruled on one of the CFTC's preliminary-injunction motions has granted it.  *See Johnson*, 2026 WL 1223373, at *1.  In the CFTC's case in the District of Arizona, the court concluded that event contracts are properly considered "swaps" because they are "tied to the outcome of certain events" and because "stakeholders have financial exposure" to the outcomes of the contracts' underlying events.  *Id.* at *3–5.  The court then determined that "field and conflict preemption independently bar" the State's effort to enforce its gaming laws against another designated contract market, citing the CEA's comprehensive scheme for regulating swaps.  *Id.* at *6–8.

66.    The CFTC has also advocated for protecting its exclusive jurisdiction by filing amicus briefs in important appeals.  Earlier this year, the CFTC filed an amicus brief in a

---

[9] *See* CFTC Arizona PI Mot.; Motion for Preliminary Injunction, *United States v. New York*, No. 1:26-cv-03404 (S.D.N.Y. May 1, 2026), Dkt. 34; Motion for Preliminary Injunction, *United States v. Wisconsin*, No. 2:26-cv-00749 (E.D. Wis. May 1, 2026), Dkt. 6; Motion for Preliminary Injunction, *United States v. Minnesota*, No. 26-cv-2661 (D. Minn. May 19, 2026), Dkt. 25.

Ninth Circuit appeal seeking to enjoin the State of Nevada's threatened enforcement action against another designated contract market, Crypto.com. *See N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. 38.2. The CFTC asserted that State efforts to "invade" the federal government's authority as it relates to swaps "present a fundamental threat to Congress's statutory design." *Id.* at 2. It argued that, because event contracts are properly considered "swaps" under the CEA, state laws regulating event contracts on CFTC-regulated markets are preempted. *Id.* at 14–27. The CFTC also expressed concern that "subjecting derivatives listed on a CFTC-registered" designated contract market—such as Polymarket US— "to State regulation would have destabilizing economic effects." *Id.* at 28–29 (cleaned up). And, last month, the CFTC filed an amicus brief in a Sixth Circuit appeal involving another prediction market's litigation against Ohio. *See* CFTC Sixth Cir. Amicus Br. 1. It again asserted its exclusive jurisdiction and warned against the State's "jurisdictional overreach." *Id.* at 1–2.

**F.    New Mexico sues another prediction market, without warning, for offering federally regulated sports-event contracts.**

67.    On June 4, 2026, New Mexico sued another CFTC-designated contract market in state court—apparently without sending a cease-and-desist letter or publicly giving any notice or warning. New Mexico alleged that, by making sports-event contracts available for trade in New Mexico, the contract market "violates numerous provisions of New Mexico's Criminal Code and Gaming Control Act." Complaint, *Torrez v. Kalshi, Inc.*, No. D-101-CV-2026-01567 (First Judicial Dist. Ct., Santa Fe Cty. June 4, 2026), ¶ 12.

68.    Concerned that New Mexico would pursue the same theory against it, Polymarket US promptly engaged the NMDOJ in an effort to avoid unnecessary litigation. The following Monday, June 8, 2026, Polymarket US conferred with NMDOJ and proposed deferring any further litigation pending resolution of the Kalshi litigation.

21

69.    After the CFTC filed its action against New Mexico on June 12, *see* CFTC New Mexico Compl., and moved for a preliminary injunction on June 18, *see* CFTC New Mexico PI Mot., Polymarket US amended its proposal to defer any enforcement action pending resolution of the CFTC's motion for a preliminary injunction.

70.    On June 29, 2026, NMDOJ rejected both of Polymarket US's offers to avoid unnecessary litigation.

71.    This is not the only time that Defendants have taken a stance against prediction markets and in favor of state regulation of such markets.  Last winter, for example, the State joined 37 other states and the District of Columbia, arguing in favor of Maryland's authority to enforce its gambling laws against Kalshi.  *See* Brief of Amici Curiae Nevada *et al.*, *KalshiEX LLC v. Martin*, No. 25-1892 (4th Cir. Dec. 22, 2025), Dkt. No. 41.  That was the first of many such briefs it has joined.[10]

72.    Given the State's enforcement action against a similarly situated contract market and refusal to agree to defer further litigation while identical legal issues are decided, Polymarket US faces the imminent threat of enforcement by New Mexico.  Like Kalshi, Polymarket US does not have a license from New Mexico's Gaming Control Board—because New Mexico may not lawfully require Polymarket US to obtain one as a condition of offering event contracts to New Mexico users.  And, similarly, although Polymarket US runs its markets in

---

[10] *See* Brief of Amici Curiae New Jersey *et al.*, *KalshiEX LLC v. Assad*, No. 25-7516, (9th Cir. Jan. 30, 2026), Dkt. No. 48.1; Brief of Amici Curiae Ohio *et al.*, *Robinhood Derivatives, LLC v. Dreitzer*, No. 25-7831 (9th Cir. Mar. 10, 2026), Dkt. No. 81.1; Brief of Amici Curiae Ohio *et al.*, *N. Am. Derivatives Exch., Inc. v. Nevada*, Nos. 25-7187, 25-7516, 25-7831 (9th Cir. Mar. 10, 2026), Dkt. No. 76.1; Brief of Amici Curiae of Nevada, Ohio, 35 Other States, and the District of Columbia, *Commonwealth v. KalshiEX LLC*, No. SJC-13906 (Mass. Apr. 24, 2026); Brief of Amici Curiae of Nevada, Utah, 39 Other States, and the District of Columbia, *KalshiEX LLC v. Orgel*, No. 26-5235, Dkt. No. 42 (6th Cir. May 26, 2026).

accordance with—and subject to the exclusive jurisdiction of—federal law, New Mexico has taken the position that these activities are within the purview of state law.

73.    The threat of enforcement against Polymarket US is real, imminent, and concrete, presenting a live and justiciable controversy.  Polymarket US is thus forced to choose between protecting its rights under federal law and exposure to imminent state enforcement, rendering this action ripe for adjudication and appropriate for injunctive relief now, not after irreparable harm has occurred.

**G.    Looming enforcement of preempted New Mexico law irreparably harms Polymarket US's business.**

74.    Given the State's definitive position—that a similarly situated contract market is violating New Mexico's Gaming Control Act and actively creating a public nuisance by offering sports-related event contracts to New Mexicans—Polymarket US faces the imminent threat of enforcement by New Mexico.

75.    The threat of enforcement against Polymarket US is real, imminent, and concrete, presenting a live and justiciable controversy.  Because Polymarket US must choose between protecting its rights under federal law and facing exposure to imminent state enforcement, this action is ripe for adjudication and the award of injunctive relief now, not after irreparable harm has occurred.

76.    The business consequences for Polymarket US arising from New Mexico's near-certain enforcement require this Court's immediate action.  An enforcement action by New Mexico—even a meritless one—would raise a red flag for Polymarket US's business partners, triggering notification and termination clauses in many of Polymarket US's agreements, and jeopardizing key partnerships crucial to the company's growth.  Additionally, Polymarket US

would lose out on potential business partners who would steer clear of a company under a cloud of enforcement proceedings.

77.    The alternative—abruptly terminating New Mexico users' access to event contracts and unwinding their current positions—is just as damaging.  Polymarket US has expended tremendous resources to garner customer goodwill and a solid reputation.  Cutting off New Mexicans from Polymarket US's event contracts—contracts that are available to users outside New Mexico—would deal a decisive blow to Polymarket US's goodwill and reputation within the State.  It would disrupt overall liquidity and impair the information that trading generates by forcing New Mexico residents off the exchange.  And it would create confusion among users about what shutting off their access to the market means for their trading positions.  Unwinding existing contracts, in particular, would confuse and frustrate both New Mexicans and users on the other side of the contracts.

78.    Further, reduced liquidity would deter customers from using the platform.  Price discovery and market efficiency are two main reasons why event contracts have predictive value (and thus why Polymarket US is attractive to users).  Reduced liquidity dampens both, meaning that termination of New Mexico-based trading hinders the orderly functioning of markets nationwide and could deter customers outside New Mexico from using the platform at all, imposing substantial burdens on interstate commerce.

79.    All told, "the prospect of" an imminent enforcement action irreparably harms Polymarket US by putting it to an impossible choice: continue operations "and expose [itself] to potentially huge [criminal] liability," on the one hand; or "suffer the injury of obeying the [preempted] law," on the other.  *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).  There is therefore "no adequate remedy at law."  *Id*.

24

**COUNT I**
**(Commodity Exchange Act Preemption)**

80.     Polymarket US incorporates the preceding paragraphs by reference.

81.     The Supremacy Clause of the United States Constitution enshrines the "Laws of the United States" as "the supreme Law of the Land," the "Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

82.     "[U]nder the Supremacy Clause, from which our preemption doctrine is derived, any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Gade v. Nat'l Solid Waste Mgmt. Ass'n*, 505 U.S. 88, 108 (1992).

83.     Federal law preempts state law (1) when Congress "explicitly define[s] the preemptive scope of its enactments," (2) when state law "regulates conduct in a field that Congress intended the federal government to occupy exclusively," and (3) when federal and state law conflict. *BNSF Ry. Co. v. Hiett*, 22 F.4th 1190, 1193 (10th Cir. 2022).

84.     The CEA bars New Mexico from purporting to regulate Polymarket US's federally regulated offering of event contracts under each form of preemption.

**A.     Express preemption bars New Mexico regulation of Polymarket US's exchange.**

85.     Congress expressly preempted state regulation of event-contracts trading on designated contract markets.

86.     Under the CEA's express terms, the CFTC, not New Mexico, has "exclusive jurisdiction" over all "accounts," "agreements," and "transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC. 7 U.S.C. § 2(a)(1)(A); *see U.S. Commodity Futures Trading Comm'n v. Reed*, 481 F. Supp. 2d 1190, 1194–95 (D. Colo. 2007) (noting that the 1974 CEA "is recognized

25

as establishing a comprehensive system for regulating futures contracts and options" and gives the CFTC "exclusive jurisdiction" over futures contracts (cleaned up)).

87. Confirming as much, the very next sentence explains that the section does not "supersede or limit the jurisdiction" of "regulatory authorities under the laws of the United States or of any State," "*[e]xcept as hereinabove provided*."  7 U.S.C. § 2(a)(1)(A) (emphasis added).

88. The CFTC's "exclusive jurisdiction" over trading on federally regulated event-contract exchanges, 7 U.S.C. § 2(a)(1)(A), therefore preempts New Mexico's supposed jurisdiction to police those exchanges, *see Leist*, 638 F.2d at 322 ("[T]he courts have held that § 2(a)(1) of the CEA preempts the application of state law."); CFTC Sixth Cir. Amicus Br. 17 (observing that Congress's conferral of "exclusive jurisdiction" meant its "expression of preemptive intent could hardly be plainer").

89. Take, for example, New Mexico law's definition of a "bet": "a bargain in which the parties agree that, dependent upon chance . . . one stands to win or lose anything of value specified in the agreement."  N.M. Stat. Ann. § 30-19-1(B).

90. This definition echoes the CEA's definition of a swap, which includes "any . . . transaction that provides for any . . . payment . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial . . . consequence."  7 U.S.C. § 1a(47)(A)(ii).  When a transaction qualifies as a swap within the meaning of the CEA, the CFTC, not New Mexico, has "exclusive jurisdiction." *Id.* § 2(a)(1)(A).

91. Event contracts do not constitute gambling.  *See supra* ¶¶ 50–58.  Moreover, the CEA's Special Rule anticipates that certain "event contracts" will "involve . . . gaming" and authorizes the CFTC to ban the trading of those contracts.  7 U.S.C. § 7a-2(c)(5)(C).  Thus, even

26

if sports-event contracts *were* a form of gaming (they are not), they would remain within the CFTC's exclusive jurisdiction and beyond the State's regulatory reach.

**B.      Implied field preemption bars New Mexico regulation of Polymarket US's exchange.**

92.      "[T]he CEA is recognized as establishing 'a comprehensive system for regulating futures contracts and options'" that grants the CFTC exclusive jurisdiction.  *Reed*, 481 F. Supp. 2d at 1194–95.  "The scope of the CEA and the long history of Congress's amendments to ensure federal law captured the evolving futures and derivatives markets make[] [that] clear."  Arizona Compl. ¶ 69; *see* CFTC Arizona PI Mot. 17.

93.      "Congress created the CFTC and amended the Act to do away with the patchwork of state regulations and bring futures trading on [designated contract markets] under the exclusive jurisdiction of the CFTC."  *Flaherty*, 172 F.4th at 230.  And through this "grant[ of] exclusive jurisdiction to the Commodity Future[s] Trading Commission," together with the "pervasive regulatory scheme established under the Commodity Exchange Act," as amended, Congress achieved its goal of "preempt[ing] the field insofar as futures regulation is concerned."  *Gonzalez v. Paine, Webber, Jackson & Curtis, Inc.*, 1982 WL 1348, at *2 (S.D.N.Y. Nov. 10, 1982); *supra* ¶¶ 35–37.

94.      The field occupied by federal law expanded when the Dodd-Frank Act "amended the [CEA] to 'establish a comprehensive new regulatory framework for swaps,' and vested the [CFTC] with exclusive jurisdiction to implement that framework."  *In re Int. Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 445 (S.D.N.Y. 2017) (footnote omitted) (quoting 78 Fed. Reg. 33,476, 33,477 (June 4, 2013)); *see supra* ¶¶ 39–42.

95.      There is no room for state interference with this "comprehensive scheme."  *See CFTC v. British Am. Commodity Options*, 560 F.2d 135, 138 (2d Cir. 1977).  "Even as derivatives

markets have developed and grown, Congress has chosen to vest the CFTC with broad jurisdiction. That a derivative is novel or different is no excuse for a court to rewrite existing law." *Chairman Selig: Op-Ed*, *supra*.

96.     Enforcement of New Mexico's gaming laws, including the New Mexico Gaming Control Act, against Polymarket US would impermissibly intrude on the CFTC's exclusive authority to police trading on CFTC-regulated exchanges.  *See*, *e.g.*, *KalshiEX LLC v. Flaherty*, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025) (holding that "at the very least[,] field preemption applies" to "sports-related event contracts" on a designated contract market), *aff'd*, *Flaherty*, 172 F.4th at 228; *Johnson*, 2026 WL 1223373, at *6 ("[The CEA's] comprehensive framework is so pervasive that it forecloses parallel state regulation of [contract market] trading.").

**C.     Conflict preemption bars New Mexico regulation of Polymarket US's exchange.**

97.     Conflict preemption also prevents enforcement of these New Mexico laws against Polymarket US because those laws stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in the CEA.  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000); *see also Flaherty*, 172 F.4th at 229 ("[C]onflict preemption also prohibits New Jersey from regulating sports-related event contracts on CFTC-licensed [contract markets].").

98.     Consider the State's position that sports-event contracts are illegal under New Mexico law.  That is not the State's decision to make:  The CEA grants the *CFTC* the authority to "determine[]" whether such contracts "involve . . . gaming" or "activity that is unlawful under any Federal or State law," and, if so, whether they should be prohibited as "contrary to the public interest."  7 U.S.C. § 7a-2(c)(5)(C)(i).

99.     Notably, the CFTC has not invoked this Special Rule to prohibit Polymarket US from listing event contracts.  Therefore, Polymarket US's event contracts evidence—by their very

28

existence—the CFTC's exercise of its discretion and implicit decision to permit them. Because the "application of state law" would countermand that decision and "directly affect trading on or the operation of [the] market, it would stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, and hence is preempted." *DGM Invs., Inc. v. N.Y. Futures Exch., Inc.*, 2002 WL 31356362, at *5 (S.D.N.Y. Oct. 17, 2002) (quoting *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156–57 (7th Cir. 1992)); *accord Flaherty*, 172 F.4th at 226 ("The Act preempts state laws that directly interfere with swaps traded on [contract markets]."); *Johnson*, 2026 WL 1223373, at *7 ("[T]he CEA preempts the regulation of trading in swaps on CFTC-registered [contract markets].").

100.    More broadly, if New Mexico attempts to ban Polymarket US's event contracts that federal law and the CFTC have authorized, New Mexico's actions would frustrate the CFTC's exclusive authority to regulate its designated exchanges. As the Supreme Court has recognized, "[t]he purpose of the exclusive-jurisdiction provision" is, among other things, to "separate the functions of the [CFTC] from those of . . . other regulatory agencies." *Merrill Lynch*, 456 U.S. at 386; *see Reed*, 481 F. Supp. 2d at 1194; *cf.* 15 U.S.C. § 8325(a) (directing the CFTC to achieve "consistent *global* regulation of swaps" (emphasis added)). Permitting a New Mexico enforcement action against Polymarket US would conflict with Congress's goal to avoid subjecting regulated exchanges to multiple conflicting legal regimes—a conflict that becomes clearer still when one considers that nothing would stop the 49 other States and the District of Columbia from equally attempting to subject Polymarket US's exchange to their own, varying laws. "This state regulation is exactly the patchwork that Congress replaced wholecloth by creating the CFTC." *Flaherty*, 172 F.4th at 230.

29

101.    In short, New Mexico may not enforce against Polymarket US state laws that federal law preempts.

**PRAYER FOR RELIEF**

An actual controversy has arisen between the parties entitling Plaintiff to legal, declaratory, and injunctive relief.

WHEREFORE, Plaintiff Polymarket US respectfully requests that this Court enter the following relief:

A.    A declaratory judgment, pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, that New Mexico state law, including but not limited to the New Mexico Gaming Control Act, Sections 30-8-1, 30-8-8, 30-19-1(B)–(C), 30-19-2, 30-19-3, 30-19-8 of the New Mexico Criminal Code, and common law are preempted under the CEA as applied to Polymarket US;

B.    Preliminary and permanent injunctions, pursuant to Rule 65 of the Federal Rules of Civil Procedure, enjoining Defendants as well as their successors, agents, and employees, from enforcing New Mexico state law, including the New Mexico Gaming Control Act and Sections 30-8-1, 30-8-8, 30-19-1(B)–(C), 30-19-2, 30-19-3 and 30-19-8 of the New Mexico Criminal Code, independently or through Section 30-8-8(B), common law, or any other state law or regulation to the extent it purports to regulate or prohibit Plaintiff's activities governed exclusively by federal law or otherwise conflicts with federal law;

C.    Any other relief within this Court's discretion that it deems just and proper.

Dated: June 30, 2026

Respectfully submitted,

**HOLLAND & HART LLP**

*/s/ John C. Anderson*
John C. Anderson
Olga Serafimova
215 Lincoln Avenue, Suite 100
Santa Fe, NM 87501
Telephone: 505.988-4421
jcanderson@hollandhart.com
omserafimova@hollandhart.com

**GIBSON DUNN & CRUTCHER LLP**

Orin Snyder*
Matt Benjamin*
Rachel Jackson*
Amanda LeSavage*
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
osnyder@gibsondunn.com
mbenjamin@gibsondunn.com
rjackson@gibsondunn.com
alesavage@gibsondunn.com

Thomas H. Dupree, Jr.*
Jacob T. Spencer*
Adam I. Steene*
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
tdupree@gibsondunn.com
jspencer@gibsondunn.com
asteene@gibsondunn.com

*Association Notices forthcoming*

*Attorneys for Plaintiff QCX LLC d/b/a Polymarket US*

38287853_v1

31